IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| Kevin A. Avery and Denise M. Avery, | ) | |
| | ) | **AMENDED** |
| Plaintiffs, | ) | **FINDINGS OF FACT, CONCLUSIONS** |
| | ) | **OF LAW, AND ORDER FOR** |
| vs. | ) | **JUDGMENT** |
| | ) | |
| John E. Ward, Special Administrator | ) | |
| of the Estate of Andrzej Furmanski, | ) | Case No. 1:16-cv-00055 |
| deceased, | ) | |
| | ) | |
| Defendant. | ) | |

## BACKGROUND

This is a personal injury action arising out the crash of a small, private aircraft on August 12, 2013, in West Yellowstone, Montana. Plaintiff Kevin Avery, who was a passenger, is seeking recovery for the personal injuries he sustained in the crash. The claim of his wife, Denise Avery, is for loss of consortium. Plaintiffs claim that the crash and their injuries were the result of negligent operation of the aircraft by its pilot, Andrzej Furmanski, who perished in the crash.

Prior to the filing of the Complaint, plaintiffs' counsel filed a Petition for Appointment of a Special Administrator in state district court for the Estate of Andrzej Furmanski. On February 12, 2016, the state court appointed attorney John E. Ward as the Estate's Special Administrator. On November 13, 2016, Mr Furmanski's widow executed an affidavit in which she acknowledge receipt of the Complaint and stated she would be neither contesting the action nor opposing the entry of judgment. In accordance with what Special Administrator Ward understood to be the wishes of the Andrzej Furmanski Estate, he did not file an answer on its behalf.

1

On July 18, 2017, following a telephone conference with the parties, the court scheduled a one day trial for September 8, 2017, to determine liability and damages.[1] Also, since the Estate had not filed an answer, plaintiffs filed a motion for default judgment on September 1, 2017.

A one day bench trial was held on September 8, 2017. Special Administrator Ward appeared and, on the record, informed the court that the Estate would not be contesting plaintiffs' evidence or objecting to the entry of a default judgment. Special Administrator Ward was then excused and the court proceeded to take evidence on the issues of liability and damages.

During the trial, the court heard testimony from the following witnesses:

1. Kevin Avery;

2. Ron Stone (plaintiffs' aviation expert);

3. Denise Avery;

4. Dr. Stephen Mann (plaintiffs' orthopaedic specialist);

5. Brandon Avery;

6. Dr. Paul Randle (plaintiffs' economist); and

7. Amber Hall.

The court also received a number of exhibits, including several expert reports, information from the NTSB investigation of the crash, photographs, and voluminous medical records.

After careful review of the evidence, the court makes the following findings of fact and conclusions of law.

---

[1] Plaintiffs and defendant have both consented to the undersigned's handling of the case for all purposes, including trial and the entry of judgment.

## FINDINGS OF FACT[2]

**Background**

1.       This case arises out of a crash of a 1954 Beechcraft E35 Bonanza (herein "Bonanza") on August 12, 2013, in West Yellowstone, Montana. The aircraft was piloted by Andrzej Furmanski, who perished in the crash. Surviving, but badly injured, was passenger Kevin Avery, one of the plaintiffs in this action.

2.       Plaintiffs Kevin and Denise Avery are husband and wife. At all times material hereto, they have been and continue to be residents of the State of Idaho.

3.       Mr. Furmanksi was a North Dakota resident. Following his death, John E. Ward, a North Dakota resident and attorney, was appointed to act as a Special Administrator of the Estate of Andrzej Furmanski for purposes of this action.

4.       Mr. Avery is the owner of an oilfield service company, Avery Enterprizes, Inc. ("Avery Enterprizes").[3] Avery Enterprizes principal place of business is located in North Dakota. That was true also at the time of the accident.

5.       Avery Enterprizes owned the Bonanza aircraft involved in the crash and employed Mr. Furmanski as its pilot and mechanic. When Avery Enterprizes acquired the aircraft in October 2012, it listed Powers Lake, North Dakota as its address in the bill of sale. At the time of the crash, the aircraft was being operated for Avery Enterprizes' business purposes.

---

[2] These are the court's principal findings of fact as required by Fed. R. Civ. P. 52(a)(1). Additional findings of fact may appear in the conclusions of law or vice versa, particularly when considering mixed questions of law and fact.

[3] "Enterprizes" is the correct spelling. The official name of the company as registered is Avery Enterprizes, Inc.

3

6. Mr. Avery was approximately 55½ years of age at the time of the crash. By the time of the trial in this case, he was several months short of 60. Mr. Avery has a high school education. Until about 2006, Mr. Avery's work history consisted largely of construction work, truck driving, and, for several years, working security as a security guard domestically and then overseas providing security to contractors working in the Middle East.

Beginning in about 2006, Mr. Avery restarted his trucking firm, Avery Enterprizes, in Wyoming. In about 2008, he moved his trucking operation to the oil fields in North Dakota at the beginning of oil boom in the "Bakken." In the several years that followed, Mr. Avery grew the size of his trucking operation from a single truck to 111 trucks in 2011. During this same time, Mr. Avery substantially increased his reported taxable income from $49,452 in 2008 to $429,306 by 2011. Corresponding to the beginning of the decline in the oil boom, Mr. Avery's reported income declined in 2012 to $269,229. After 2012, his income declined further due to two factors, one being a further decline in oil activity and the other his inability to personally manage his trucking operation for an extended period following the crash. By 2017, Avery Enterprizes was down to 11 trucks and at that point struggling to survive.

7. Plaintiff Denise Avery has been married to Mr. Avery since November 2011. Both had been married previously and, for Mr. Avery, this was his fifth marriage. Collectively, they have eleven adult children from the prior marriages and a number of grandchildren. By all accounts, plaintiffs' marriage at the time of the accident was a sound one with the same remaining true now despite the injuries sustained by Mr. Avery and their very uncertain financial future. Following the accident, Mrs. Avery rushed to the hospital and stayed with Mr. Avery for the approximate five weeks he remained hospitalized. Following Mr. Avery's discharge, Mrs. Avery was her husband's

4

primary care-giver during a further period of recovery and rehabilitation when they lived with Mr. Avery's mother in her home so they could be near the hospital before eventually returning to their own home.

**Liability**

8. On August 12, 2013, Mr. Avery and Mr. Furmanski began their flight in Preston, Idaho. From there, they flew to Rigby, Idaho, where Mr. Avery conducted a short business transaction. They then departed for Roundup, Montana, where they intended to take on fuel en route to Tioga, North Dakota, the intended final destination.

9. Between West Yellowstone and Gardner, Montana, the aircraft's electrical generator failed, limiting the electrical power for the aircraft to that provided by the battery. Mr. Furmanksi decided to turn the plane around and land at the West Yellowstone Airport. At that point, the situation was not critical in that the aircraft was flyable and the battery was providing electrical power for its critical operations.

10. In approaching the airport, Mr. Furmanski attempted to radio the fixed-base operator on the ground, but was unable to hear any response. Those on the ground, however, heard Mr. Furmanski and, after the crash, reported that he sounded calm and relaxed during his initial transmissions.

11. The Bonanza has retractable landing gear. In this instance, the landing gear had to be manually extended using a crank due to the failure of the generator. This was because the aircraft's design was such that the battery did not supply power to the motor that lowered the gear because it would overtax the battery. After the crank was employed to lower the gear, an additional

problem developed: Mr. Furmanski was unable to determine whether the gear had fully extended because the light on the cockpit dash that would so indicate did not illuminate.

12. Unable to determine whether the gear was fully extended, Furmanski made two low-level passes over the airport in an attempt to get visual confirmation from someone on the ground that the landing gear had been successfully lowered. According to witnesses, the first pass was between 100-200 feet off the ground and the second less than a 100 feet - a very low level. After completing the second pass and still at low level, Furmanski made a sharp turn to line the aircraft up with the runway in an apparent attempt to land. But, in making the turn, he put the plane in a semi-stall condition referred to by plaintiffs' aviation expert as "mushing." With insufficient altitude to recover from this condition, the plane crashed into an embankment short of the runway. Just prior to impact, Furmanski pulled the nose of the aircraft up to avoid a direct nose-first impact. This likely saved Mr. Avery's life, but, unfortunately, not Mr. Furmanski's.

13. The proximate cause of the crash was pilot error. The error most directly resulting in the crash was Mr. Furmanski's handling of the aircraft after the second pass. There is no evidence to suggest that an immediate landing was required at that point. With the aircraft still flyable and not in immediate distress, Furmanski had the opportunity to gain altitude and make a wider turn and approach back to the airport. In other words, there was no reason, other than pilot error, for the plane to have crashed under the circumstances in which it did. The evidence that the plane was not in immediate distress is based on what Mr. Avery recalls taking place immediately prior to the crash, the observations of those on the ground who reported that the aircraft appeared to be operating normally with sufficient power, and the post-crash investigation that revealed no problems with the aircraft, save for the failed generator, including that the battery had 60% of its capacity still available.

14. Another point of pilot error was Mr. Furmanski's operation of the radio. The post-crash investigation concluded that the radio was operating prior to the crash. This was based on the fact that persons on the ground heard Furmanski's transmissions as well as the fact that a post-crash examination of the radio revealed that its volume knob had been turned all the way down. The latter is likely the reason why Furmanski did not hear the ground transmissions in response to his own. Had Furmanski checked the volume control when he was unable to hear any response to his communications and turned it up, he would have had voice communication with the ground. This likely would have resulted in his being able to learn that the landing gear was down, which was confirmed by the observations of those on the ground. And, armed with that knowledge, Furmanski may very well have been less distracted and made better decisions in terms of his handling of the aircraft.[4]

15. Mr. Avery was not a pilot. The court finds that Mr. Avery was not at fault and that it was the fault of Mr. Furmanski that proximately caused the crash and the resulting injuries of Mr. and Mrs. Furmanski as described next.

**Injuries**

16. While Mr. Avery survived the crash, he was very seriously injured. He was taken by ambulance to a life-flight, Air Idaho Rescue, that transported him to the Eastern Idaho Regional Medical Center in Idaho Falls, Idaho, where he was treated for multiple physical injuries. Notably,

---

[4] One possible reason why the gear light did not illuminate was that the wrong fuse may have been pulled before the gear was manually lowered. The required procedure for manually lowering the gear per the aircraft's manual was to pull the fuse that controlled the motor to prevent it from inadvertently engaging while manually cranking the gear down and causing injury. There is some possibility that the fuse controlling the gear light was pulled out by mistake instead. If that is what happened, the fault would also fall upon Mr. Furmanski, both as the pilot and mechanic for the aircraft, in that one of things he should have checked when the light did not illuminate was whether its fuse was in place and properly seated.

Mr. Avery's spine was severely fractured, including a burst fracture of L4 that caused a retropulsion of vertebral-body fragments into the spinal canal. His face was smashed, most prominently in the area of his eyes and nose and inner sinus areas. His left hip was fractured - the broad, main bone of the hip (the ilium), the lower part of the pelvis (pubic ramus), and the hip socket (the acetabulum). His left shoulder was fractured. Both ankles were severely fractured. He also had other internal injuries, including hemorrhage to the right adrenal gland, as well as a number of dental injuries.

17. Mr. Avery remained a patient at the Eastern Idaho Regional Medical until his discharge on September 18, 2013. During his stay there, he under went the following surgical procedures:

- August 12, 2013 - closure of facial lacerations and tracheostomy

- August 13, 2013 - spinal fusion due to unstable L4 fracture.

- August 14, 2013 - an open reduction and internal fixation of the acetabulum (socket of the hip joint) and left talus (the principal ankle bone).

- August 16, 2013 - an open reduction and internal fixation of facial fractures performed using Titanium mesh to provide stability for his eye socket.

- August 18, 2013 - an upper GI endoscopy for a PEG tube insertion (a tube placed through the abdominal wall to permit feeding).

- August 28, - an L4 corpectomy (removal of part or all of the vertebral body) with placement of bone graft and hardware for anterior fusion. Ultimately, Mr. Avery had a fusion of L2 to SI, essentially his entire lumbar spine.

- September 6, 2013 - a displaced lateral process talus fracture.

- September 6, 2013 - Bilateral anterior posterior ethmoidectomy with removal of diseased tissue out of those sinuses and a bilateral maxillary antrostomy (a procedure that clears the sinus of blockage) with removal of diseased tissues out of those sinuses.

Upon discharge, Mr. Avery continued on rehabilitation and his permanent impairments required numerous subsequent followup medical visits as well as additional procedures.

18. The injuries sustained in the crash have left Mr. Avery permanently impaired. His orthopedic injuries limit his ability to ambulate (he can only do so slowly and with somewhat of a hobble) and cause him continued pain and discomfort. He has problems with balance along with some neurological dysfunction as a result of spinal cord injury that causes, among other things, difficulty with the use of his right leg. He has problems with forgetfulness as result of the trauma to his brain. As result of his face being smashed, he has 43 screws and a metal plate in his face that causes discomfort when he smiles the wrong way or sleeps on it wrong. He has numerous floaters in his right eye and blurred vision. His right eyelid is paralyzed open resulting in it frequently weeping because of the inability to close it. Mr. Avery also suffers from continued sinus issues, erectile dysfunction, and tinnitus (ringing of the ears). Finally, Mr. Avery's appearance has been impacted, including his facial features. Notably, with the flattening of his nose and the other damage to his face, he now has the appearance of a heavy-weight boxer who has gone too many rounds. In addition, the residuals of the reconstruction work and the fact he has a plate beneath his skin are noticeable up close.

The prognosis is that a number of these impairments are likely to get worse as Mr. Avery ages. Consequently, even though his recovery to date is remarkable in view of the severity of his

injuries in that he can now ambulate and engage in some activity, the likelihood is that he will become more limited over time and will need substantial medical and other care in the future.

**Economic Loss**

19.     Mr. Avery presented detailed evidence of his medical care and its costs. The court finds: (1) that the total cost of the care that Mr. Avery received up to the date of the trial for the injuries sustained in the accident is $1,064,540; (2) that the expenses making up this total were reasonable in amount; and (3) that the care provided was reasonably necessary for the injuries sustained.

20.     Mr. Avery presented testimony from an economist along with a report that addressed both his past and future wage and fringe benefit losses resulting from the accident. To avoid the problem of coming up with a fair estimate of Mr. Avery's wage and fringe benefit losses due to the decline in business of Avery Enterprizes resulting in part from the decline of oil activity and in part due to Mr. Avery's inability to provide it with the requisite management (including maintaining the personal relationships with others working in the field that often are a key to successfully obtaining and maintaining work even at a reduced level), the economist conservatively estimated the loss based simply what Mr. Avery would have earned himself as a trucker during the time periods in question based on the average wages and benefits paid to truckers in the region. The court agrees with the conservative approach taken by the economist, noting the likelihood of it having underestimated the actual loss.[5]

---

[5] Although the downturn in oil activity would likely have had substantial affect on the business of Avery Enterprizes even if Mr. Avery had not been hurt, it may not have suffered the decline that it did. With Mr. Avery present and maintaining the personal relationships he had successfully built with his customers, Avery Enterprizes might have been able to operate at a reduced but greater level than it did and provided Mr. Avery with income significantly greater than what plaintiffs' economist used in his estimate.

For the period from the date of the accident to the time of the trial, the court agrees with the economist's estimate of the losses and finds that Mr. Avery suffered past wage and fringe benefit loses of $203,003 and $71,193, respectively, for a total past wage and benefit loss of $274,196.

With respect to the loss of future wages and benefits, the economist estimated the losses to be $689,827 and $241,922. While the court agrees with the overall approach taken by the economist, it did question the inclusion in his estimate of the cost of obtaining a replacement driver for Avery Enterprizes. After the court expressed concern about this item, plaintiffs' counsel agreed there should be an adjustment and those costs removed. With that adjustment, the court finds that Mr. Avery suffered future wage loss of $434,895 and loss of future fringe benefits of $152,517, for a total of future wage and benefit loss of $587,412. Notably, these amounts are after the totals of the calculated losses were appropriately reduced to present value.

21. Mr. Avery also presented evidence of future economic loss for reasonably anticipated future medical care, including costs for future doctor visits, pain medication, additional diagnostic tests and medical procedures, rehabilitation, and orthopedic assistive devices. The estimates of these future expenses were made by qualified medical and life-care planning experts. Further, after these estimates were made, plaintiffs' economist adjusted the stream of anticipated future expenses for inflation and then reduced the adjusted amounts to present value to arrive at an amount that would fairly compensate for the future expenses. The court finds the estimated costs and adjustments to be reasonable and that fair compensation for the additional costs that Mr. Avery is likely to incur for future medical care as a result of the injuries sustained in the crash is $572,417.

**Non-Economic Loss**

22.     As a result of the crash, Mr. Avery suffered significant pain and discomfort from the injuries sustained in the accident, the numerous medical procedures, and the lengthy period of rehabilitation.  Since completing the initial period of rehabilitation and going forward, Mr. Avery has suffered and will continue to suffer ongoing: chronic pain, discomfort, and limitations upon his physical activity resulting from his numerous orthopaedic and neurological injuries; sinus and eye issues; difficulty in sleeping; memory difficulties; tinnitus; blurred visions; marital intimacy issues; and disfigurement - all of which on a daily basis have interfered with and will continue to interfere with his daily living and enjoyment of life.  In addition to the physical impairments and medical issues, Mr. Avery's uncertain medical and financial future have caused and are continuing to cause considerable stress and anxiety.  The court finds that Mr. Avery has suffered past non-economic loss based on these and other items detailed in the evidence of $ 1,300,000 and will suffer future non-economic loss of $ 2,000,000.

**Mrs. Avery's Consortium Claim**

23.     Mrs. Avery has suffered and will continue to suffer from the loss of Mr. Avery's ability to provide her the same level of care, comfort, support, and companionship as existed prior to the crash.  Their relationship has been significantly affected by, among other things, Mr. Avery's significant physical impairments, pain, anxiety, memory issues, and impairments affecting their marital intimacy.  The court finds that Mrs. Avery has been damaged in the amount of $800,000.

**CONCLUSIONS OF LAW**

24. The court has jurisdiction over the parties and the subject matter of this action pursuant to 28 U.S.C. § 1332.

25. In diversity jurisdiction cases, the court is required to employ the choice-of-law analysis of the forum state. E.g., Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Shelby County Health Care Corporation v. Southern Farm Bureau Cas. Ins. Co., 855 F.3d 836, 841 (8th Cir. 2017). Of particular note in terms of this case is the North Dakota Supreme Court's rejection in Issendorf v. Olson, 194 N.W.2d 750 (N.D.1972) of the *lex loci delicti* doctrine that it had employed in tort cases in favor of a "significant contacts" analysis. In deciding what law should be applied using this approach, North Dakota courts employ a two-pronged approach. The first is to determine all relevant contacts that might affect the decision of which law to apply. The second is to apply the following "Leflar" choice-influencing factors: 1) predictability of results; 2) maintenance of interstate and international order; 3) simplification of the judicial task; 4) advancement of the forum's governmental interests; and 5) application of the better rule of law. E.g., Nodak Mut. Ins. Co. v. Wamsley, 2004 ND 174, ¶¶ 1–13, 687 N.W.2d 226.

In this case, the court has court has considered the relevant contacts (*i.e.*, plaintiffs being Idaho residents, the accident occurring in Montana, the decedent pilot and his Special Administrator being North Dakota residents, and North Dakota being Avery Enterprizes principal place of business). Of these five Leflar choice-influencing factors, none tilt the balance in favor of any particular state's law. And, while there is some convenience in applying North Dakota law, given

the court's familiarity with it, it cannot be said that the application of either Idaho or Montana law would be a particularly difficult task.

After careful consideration of all of the factors, the court concludes North Dakota law should be applied given the more significant contacts with North Dakota, including: (1) Mr. Furmanski being a North Dakota resident; (2) North Dakota being Avery Enterprizes' principal place of business; (3) Avery Enterprizes owning the aircraft and it being used for business purposes at the time of the accident; (4) Avery Enterprizes having employed Mr. Furmanski; and (5) North Dakota being the intended final destination of Mr. Avery and Mr. Furmanski.[6]

26. Mr. Furmanski's operation of the aircraft on August 12, 2013, was negligent and a proximate cause of the injuries suffered by plaintiffs.

27. The Estate of Andrzej Furmanski has not answered or otherwise contested the evidence presented by the plaintiffs as to liability and damages. As a consequence, the Estate is in default and otherwise liable for the negligent acts of Mr. Furmanski.

28. Based on the court's independent assessment of the record evidence, Mr. Avery is entitled to recover from the Estate of Andrzej Furmanski, acting through its appointed Special Administrator John E. Ward, the following amounts:

Economic Loss

    Past economic loss (income & medical)    $1,338,736

---

[6] As noted earlier, after departing Idaho for Tioga, North Dakota, Mr. Avery and Mr. Furmanski had planned only a brief stop in Roundup, Montana to refuel.

| | |
|---|---|
| Future economic loss (income & medical) | $1,159,829 |

Non-economic loss

| | |
|---|---|
| Past non-economic loss | $1,300,000 |
| Future non-economic loss | $2,000,000 |

In addition, the court in its discretion awards Mr. Avery prejudgment interest on his past economic and non-economic losses at the rate of 6% per annum to the date of entry of judgment. See Gonzalez v. Tounjian, 2003 ND 121, ¶¶ 35-42, 665 N.W.2d 705.

29. Mrs. Avery is entitled to recover from the Estate of Andrzej Furmanski, acting through its appointed Special Administrator John E. Ward, with respect to her loss-of-consortium claim in the amount of $800,000.

## ORDER FOR JUDGMENT

Based on the foregoing findings of fact and conclusions of law, it is hereby **ORDERED** and **ADJUDGED** as follows:

1. Plaintiff Kevin Avery shall have judgment against the Estate of Andrzej Furmanski and John E. Ward, in his capacity as Special Administrator of the Estate of Andrzej Furmanski, in the amount of $6,473,069, which is inclusive of prejudgment interest.

2. Plaintiff Denise M. Avery shall have judgment against the Estate of Andrzej Furmanski and John E. Ward, in his capacity as Special Administrator of the Estate of Andrzej Furmanski, in the amount of 800,000.

**JUDGMENT SHALL BE ENTERED ACCORDINGLY.**

Dated this 15th day of November, 2017.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr., Magistrate Judge
United States District Court